# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
## Senior Judge Marcia S. Krieger

**Civil Action No. 17-CV-2462-MSK-**SKC

**C.W., a minor,**
    **by and through his parents B.W. and C.B.,**

    **Plaintiff,**

*v.*

**DENVER COUNTY SCHOOL DISTRICT NO. 1,**

    **Defendant.**

---

## OPINION AND ORDER ON ADMINISTRATIVE APPEAL
## AND ON MOTION FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court on the parties' Cross Motion for Summary Judgment (**## 56**, **57**), their Responses (**# 58**, **59**), and their Replies (**# 60**, **61**). Upon consideration of the arguments presented in light of the Administrative Record (**# 29**), the Administrative Law Judge's decision is reversed, the Plaintiff's Motion is granted, in part, and the Defendant's Motion is granted, in part.

## I. JURISDICTION

The Court has jurisdiction over an appeal from a final decision of the Colorado Office of Administrative Courts under 20 U.S.C. § 1415(i)(2)(A) and over claims presenting a federal question under 28 U.S.C. § 1331.

1

## II. BACKGROUND[1]

Though the parties have a lengthy history of disputes over the educational services at issue in this case, the Court only recounts the facts relevant to the limited issue on appeal.[2]

Plaintiff C.W. is a minor child enrolled in the Defendant Denver County School District (the District). He has tested as a highly gifted and talented student, but suffers from a number of disabilities, including an autism spectrum disorder, obsessive compulsive disorder, generalized anxiety disorder, Ehlers-Danlos Syndrome, Tourette's disorder, an eating disorder, encopresis, and a sleep disorder, all of which entitle him to special education and related services.

In conformance with the Individuals with Disabilities Education Act (IDEA),[3] a team comprised of C.W.'s parents and District personnel assessed C.W.'s needs. Due to the severity and complexity of his disabilities, beginning in 2012, they determined that the least restrictive environment for his public education was at his home. Consequently, his October 2012 Individual Educational Plan (IEP) recommended educational placement at his home. By the

---

[1] The Court recounts the facts as stated in the administrative decision (**# 29 at 226–47**), giving due weight to factual findings, and supplementing them by references to the record. *See L.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004). For ease of reference, common acronyms are used by the parties and the Court. The IDEA is the Individuals with Disabilities in Education Act. A FAPE is a Free Appropriate Public Education. An IEP is an Independent Education Plan.

[2] Because C.W.'s parents prevailed on claims pertinent to school years 2014–2015, 2015–2016, and 2016–2017, the Court understands that this challenge is limited to a single adverse ruling made by the ALJ — that the 2017 IEP was reasonably calculated to provide C.W. with a FAPE.

[3] It is undisputed the IDEA requires that Colorado provide a free appropriate public education (FAPE) to all eligible children. 20 U.S.C. § 1412(a)(1). A FAPE includes both special-education instruction and related services to assist in the child's benefit from instruction. 20 U.S.C. § 1401(9), (26), & (29). Such instruction and services are memorialized in the child's IEP, developed in a collaborative process involving both parents and educators. 20 U.S.C. §§ 1401(9)(D), 1414.

end of the 2015–2016 academic year, however, after the extended medical absence of his in-home teacher, C.W. could only maintain focus for 10 to 15 minutes and could not tolerate 20 hours of instruction per week.[4]

C.W.'s IEP team convened an IEP meeting in July 2016. It proposed home instruction to start, transitioning to attendance at Morey Middle School, a magnet school for gifted students. District personnel expressed concerns at the meeting that C.W. was not progressing in home instruction such that a "more clinical approach such as day treatment" might be warranted, after which C.W. could return to home instruction. (**# 29 at 234**.) The Parents opposed this suggestion.

Bryan Sanchez was assigned as C.W.'s home teacher in August 2016. Things started out positively; C.W. attended two extracurricular clubs at Morey. But C.W. only went a few times and by October, he refused to go. Mr. Sanchez tried various instruction techniques to get C.W. to focus, but he had a difficult time getting C.W. off his iPad to engage in instruction.

In October, the IEP team met to discuss C.W.'s planned transition into school-based instruction. The Parents stated they were having difficulty getting C.W. to come out of his room or wear pants, and that they did not think he could attend school. At the meeting, the District received authorization from the Parents to conduct social, emotional, motor, and health evaluations, as well as occupational and physical therapy evaluations, but apparently they were never performed.

---

[4] Also in 2016, the Parents filed a complaint with the Department of Education's Office for Civil Rights. The District acknowledged that it owed C.W. 150 hours of compensatory services due to personnel difficulties it had staffing C.W.'s home instruction. The ALJ found that the District still had not provided these compensatory services but was willing. With C.W.'s "limited ability to focus for more than an hour or two per day, it has been difficult, if not impossible, for the District to provide the agreed upon compensatory services in a homebound placement." (**# 29 at 234**.)

As the year went on, C.W. began refusing to come downstairs for instruction, and even when he did, he refused to work at the table, could not wear pants, shut down if he was not interested, or complained of hunger, headaches, or fatigue. Of 67 visits by Mr. Sanchez to C.W.'s home, C.W. was not ready 58 times. As a result, Mr. Sanchez was not able to engage C.W. for 10 hours of home instruction even though his work schedule allowed for it. C.W.'s willingness to engage in anything academic declined in his estimation. Another teacher who had worked with C.W. in previous years noticed the same resistance to instruction, noting that C.W. appeared to act like a different child. Multiple teachers had to leave the house without working with C.W. because he took so long to come downstairs.

When faced with these challenges, the District modified the rules governing home instruction to include a requirement that C.W. sit at a table and wear shorts or pants. The modified rules also provided that a teacher was to leave and mark C.W. as a No Show if he took longer than 15 minutes to come downstairs. The rules were sent to the Parents on February 6, 2017, with a note that the modifications were not meant as punishment, but to ensure C.W. was able to receive instruction.

The District ultimately convened an IEP meeting on February 10 to address the foregoing challenges. At the meeting, all of C.W.'s providers agreed he was regressing. District personnel expressed concern that C.W.'s disabilities were so severe that instruction at his home was no longer tenable. The team initially discussed day treatment as an option, but decided against it because it would be too stressful for C.W. on top of logistical difficulties getting him to treatment. Over the Parents' objection, the team determined that C.W.'s designated placement should not be his home and instead should be a residential-treatment facility.

Upon consideration of C.W.'s parents' complaint and evidence presented at a hearing, an

Administrative Law Judge (ALJ) held that the District had violated the IDEA during the 2014–2015, 2015–2016, and 2016–2017 academic years, and awarded unspecified compensatory relief. But the ALJ found that the 2017 IEP was reasonably calculated to provide C.W. with a free appropriate public education (FAPE). The ALJ agreed with the IEP team because C.W. could not attend public school and was regressing in his abilities while receiving home instruction. The ALJ noted that day treatment was not an option because of stress and logistics, but also that it had become virtually impossible for the District to provide home instruction to C.W. The District having considered and tried multiple options to fulfill its obligation to C.W., the ALJ held that a residential facility was the most appropriate placement to receive the services he needs. Because the District had yet to find an appropriate residential facility for C.W., the ALJ also held that the District would owe C.W. additional compensatory services for the time spent finding an appropriate facility.

C.W.'s parents now bring several claims. In its first claim for relief, the Amended Complaint (**# 16**) seeks review and reversal of the ALJ's determination pursuant to 20 U.S.C. §1415(C). The second claim alleges that the District's past and present actions violate § 504 of the Rehabilitation Act of 1973. The third claim alleges that the District's past and present actions violate Title II of the Americans with Disabilities Act. The fourth claim alleges that the District's actions (not circumscribed by time or otherwise described) violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution. The parties have filed cross motions for summary judgment on all claims (**## 56**, **57**).

### III.   ADMINISTRATIVE APPEAL

The Court's standard of review in IDEA cases is less deferential than it is to other administrative decisions. *See Thompson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1149 (10th

5

Cir. 2008). The Court applies a "modified *de novo*" standard, independently reviewing the administrative record and rendering a decision by a preponderance of the evidence. *See id.*; *Murray v. Montrose Cty. Sch. Dist. RE-1J*, 51 F.3d 921, 927 (10th Cir. 1995). The Court must, however, give "due weight" to the administrative decision's findings of fact, "which are considered *prima facie* correct." *L.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004).

States receiving federal funds for education must, among other things, provide a free appropriate public education (FAPE) to all eligible children. 20 U.S.C. § 1412(a)(1). A FAPE includes special-education instruction and related services to assist in the child's benefit from instruction. 20 U.S.C. § 1401(9), (26), & (29). Such instruction and services are memorialized in the child's individualized education program (IEP), which is to be developed in a collaborative process involving both parents and educators. 20 U.S.C. §§ 1401(9)(D), 1414. "The IEP is a written statement that sets forth the child's present performance level, goals and objectives, specific services that will enable the child to meet those goals, and evaluation criteria and procedures to determine whether the child has met the goals." *Ass'n for Cmty Living v. Romer*, 992 F.2d 1040, 1043 (10th Cir. 1993). The IEP is the means through which special education and related services are "tailored to the unique needs" and circumstances of a particular child — "the centerpiece of the statute's education delivery system for disabled children." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1 (Endrew II)*, 137 S. Ct. 988, 999 (2017).

A FAPE has both substantive and procedural components. The Court determines whether the district complied with the IDEA's procedural requirements and whether the IEP developed by those procedures is substantively adequate. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07 (1982). If a district meets both substantive and procedural requirements, it "has

complied with the obligations imposed by Congress and the courts can require no more." *Id*. at 207. To "meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew II*, 137 S. Ct. at 999.

For children not "fully integrated in the regular classroom and not able to achieve on grade level", the IEP "must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." To be *reasonably calculated* to accomplish a particular objective requires "a prospective judgment by school officials [and] contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." Review of an IEP considers the question of whether the IEP is reasonable, not whether it is ideal. *Id*. at 999–1000.

The IDEA does not require that an IEP "provide a child with a disability opportunities to achieve academic success, attain self-sufficiency, and contribute to society that are substantially equal to the opportunities afforded to children without disabilities." The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created. *Id*. at 1001.

As noted above, C.W.'s 2017 IEP provided for education in a residential facility, but none was designated. This conclusion was based on findings that C.W. had failed to make progress with home instruction despite numerous efforts made by District personnel. The ALJ agreed with the District concluding that day treatment was not an option because of stress and logistics, and that it had become impossible for the District to provide home instruction to C.W. Because the District had not found an appropriate residential facility for C.W., the ALJ also held that the District would owe C.W. compensatory services for the time spent finding one.

A significant portion of the Parents' briefing is devoted to events that postdate the ALJ's determination, particularly the failure of the District to designate a residential facility for C.W. As significant as those complaints are,[5] however, this Court cannot address them. Its jurisdiction is in an appellate capacity; it reviews the ALJ's factual findings and conclusions of law. *See L.B.*, 379 F.3d at 974. Although it applies a modified *de novo* review standard, the Court is not free to consider entirely new issues not presented to the ALJ. *Id.* Thus, the only issue presented here is whether the ALJ erred in concluding that C.W.'s 2017 IEP provided him a FAPE.

C.W.'s Parents argue that the 2017 IEP failed to provide him with a FAPE because it did not specifically identify the residential facility where C.W. would be educated. Specifically, the Parents contend that an IEP automatically violates the IDEA and denies C.W. a FAPE if it does not name the *location* that is ready, willing, and able to implement an IEP.[6] They cite to a Fourth Circuit case holding that "because it failed to identify a particular school, the IEP was not reasonably calculated to enable [the student] to receive educational benefits." *See A.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 681 (4th Cir. 2007).

It is undisputed that the 2017 IEP did not identify a specific residential facility where C.W. would receive educational services. (**# 29 at 238**.) And the IDEA clearly requires an IEP to specify "the anticipated frequency, *location*, and duration of those services" to be provided. 20 U.S.C. § 1414(d)(1)(A)(i)(VII) (emphasis added). The Tenth Circuit, however, has not interpreted the word *location*, and there is authority indicating that *location* does not mean the

---

[5] To the extent the Parents are aggrieved in any way by the District's conduct as it relates to the implementation of this IEP, they need to bring those issues before the ALJ. Accordingly, the Court will proceed to discuss the alleged errors in the ALJ's decision.

[6] This alleged error is, in essence, a procedural violation of the IDEA because it challenges the form of the IEP, rather than the notion of a residential facility itself.

actual, physical location of services such that an IEP is automatically deficient without such specification. The Department of Education has issued commentary on a related regulation that indicates the meaning of location is broader than the mere physical location of services — "location of services in the context of an IEP generally refers to the type of environment that is the appropriate place for provision of the service. For example, is the related service to be provided in the child's regular classroom or resource room?" *T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 419–20 (2d Cir. 2009) (quoting *Assistance to States for the Education of Children with Disabilities and the Early Intervention Program for Infants and Toddlers with Disabilities*, 64 Fed. Reg. 12,406, 12,594 (March 12, 1999)); *accord Brad K. v. Bd. of Educ. of City of Chicago*, 787 F. Supp. 2d 734, 740 (N.D. Ill. 2011) ("The physical location for implementing an IEP need not be included in the IEP."); *cf. Rachel H. v. Dep't of Educ. of Hawaii*, 868 F.3d 1085, 1092–93 (9th Cir. 2017) (holding that the IEP sufficiently identified the location of the student's services by stating that she would attend "a public high school").

The Parents rely on the Fourth Circuit's decision in *A.K.,* in which a divided panel reasoned "that the school at which special education services are expected to be provided can determine the appropriateness of an education plan," making location "a critical element for the IEP to address." 484 F.3d at 680. That court focused upon the information available to the Parents, noting that they required sufficiently specific information to effectively evaluate the IEP, and that in the situation they faced[7] without identification of the location for special education services, they lacked sufficient information to evaluate the school district's offer. The court emphasized that its holding did not mean a district could *never* offer a FAPE without identifying a particular location, but when "parents express doubt concerning the existence of a

---

[7] The Parents contended that there were few or no schools that could accommodate the Plaintiff due the complexity of his disabilities.

particular school that can satisfactorily provide the level of services that the IEP describes, the IEP must identify such a school to offer a FAPE." *Id*. at 680–82. Thus, by not identifying a location, the district placed an undue burden on the parents to eliminate inappropriate placements, making it more difficult to decide whether to accept or challenge the IEP.

Actually, *A.K.'s* reasoning and conclusion is not inconsistent with that in *T.Y.* and *Rachel H.* because all these courts agree that the failure to include a specific location is not a *per se* violation of the IDEA. *See Rachel H.*, 868 F.3d at 1092–93; *T.Y.*, 584 F.3d at 420; *A.K.*, 484 F.3d at 682. Rather, the significance of the failure to designate a specific location depends upon the facts of each case.[8] Indeed, both *T.Y.* and *Rachel H.* recognize that in more demanding circumstances, the failure to include a specific location may rise to the denial of a FAPE. *See Rachel H.*, 868 F.3d at 1093 ("This does not mean . . . that not identifying a school can never result in a denial of a FAPE, especially when a child's disability *demands delivery of special education services at a particular facility*." (emphasis added)); *T.Y.*, 584 F.3d at 420 ("We emphasize that we are not holding that school districts have carte blanche to assign a child to a school that cannot satisfy the IEP's requirements.").

Thus, the question becomes whether a specific location was required in C.W.'s IEP. There is no dispute that the severity and complexity of C.W.'s disabilities were increasing by 2017, and that there appeared to be no educational option for him outside of a residential facility. Indeed, the ALJ found that "the District had been unable to find an appropriate facility for C.W."

---

[8] The Court notes that the facts of this case are a lot closer to *A.K.* than the other cases. A.K., like C.W., was diagnosed with numerous disorders, including semantic pragmatic language disorder, Aspergers Syndrome, and obsessive compulsive disorder, all requiring specialized instruction. 484 F.3d at 675. Though no disability is trivial, C.W. presents a more severe case than many other students with disabilities, including those addressed by other courts in connection with this issue. *See Rachel H.*, 868 F.3d at 1087; *T.Y.*, 584 F.3d at 416; *Brad K.*, 787 F. Supp. 2d at 737.

(**# 29 at 238**.)   This changed the question before the ALJ from the District's failure to specify a particular facility chosen among several options to a failure to designate *any* facility.   Such decision is akin to an IEP stating that a student cannot attend any school in the District but providing no other alternative.   The effect is to assign the student to a school that cannot satisfy the IDEA's requirements.   *See T.Y.*, 584 F.3d at 420.   Here, the IEP did not apprise the parents of any facility where C.W. would receive educational services.   As a result, it did not designate a facility that could provide needed services and it did not provide critical information to C.W.'s parents that there was no facility available.[9]   *See A.K.*, 484 F.3d at 681.   In essence, the IEP did not offer any means by which to provide services.

The deficient IEP left C.W.'s parents "to fend for themselves"; C.W. had been without instruction for four months at the time of the decision.   *See A.K.*, 484 F.3d at 681.   As in *A.K.*, where the record reflected that at least two of five placement options said they could not satisfy his special needs without even meeting him, the District's failure to find a suitable residential facility in four months' time highlighted the need for the IEP team and the IEP to identify a particular school.   This case therefore presents an excellent example of the circumstances under which inclusion of a particular school in an IEP can be determinative of whether a FAPE has been offered — the offer of an unspecified residential facility that may not even exist is no offer at all.

The Court has no difficulty in concluding that the deficient IEP rises to the level of a substantive violation.   The Supreme Court has explained that IDEA's procedural safeguards are important.   *Rowley*, 458 U.S. at 205.   But merely identifying a procedural deficiency does not automatically entitle a family to relief.   *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist.*

---

[9]   This required, in the District's estimation, another IEP meeting "to determine what services for C.W. are appropriate."   (**# 29 at 238**.)   But it is hard to understand based on this record what was left to discuss in light of the District's inability to find any facility that could meet C.W.'s needs.

*RE-1 (Endrew I)*, 798 F.3d 1329, 1338 (10th Cir. 2015), *overruled on other grounds by Endrew II*, 137 S. Ct. 988. A procedural failure that significantly impedes parents' opportunity to participate in the FAPE decisionmaking process or causes a deprivation of educational benefits, impedes the child's right to a FAPE. *Id*. (quoting 20 U.S.C. § 1415(f)(3)(E)). Here, the District's failure to designate a facility to meet C.W.'s needs was the equivalent of providing none and failing to admit that it could not provide required services. The ambiguity in the IEP impaired C.W.'s receipt of educational services and prevented his parents from exercising procedural and substantive rights on his behalf. As a result, he was denied a FAPE. Accordingly, the Court reverses the determination by the ALJ, and directs upon remand that the ALJ determine the relief to which C.W. is entitled during the period the 2017 IEP was operative.

### IV. MOTION FOR SUMMARY JUDGMENT

C.W. also bring claims under other federal statutes: the Rehabilitation Act, Americans with Disabilities Act (ADA), and Equal Protection Clause of the Constitution. Invoking Federal Rule of Procedure 56, the District contends that C.W. has not exhausted administrative remedies required for these claims, and thus they must be dismissed.

**A. Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment or dismissal only if no trial is necessary. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby Inc.*,

477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus. Inc. v. Arvin Indus. Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

This case nominally involves cross motions for summary judgment. However, because C.W.'s motion really requests a determination based on the appellate record, it is not a true motion for summary judgment nor does it address all of the claims asserted. The District's Motion actually seeks a partial summary judgment only as to the non-IDEA claims. Thus, the Court deals with the motions separately.

**B. Discussion**

With regard to his claims under the Rehabilitation Act, ADA, and Equal Protection Clause, the District argues that C.W. failed to exhaust his administrative remedies. Although the IDEA offers no procedural guidance, the Court approaches this in the same manner as it would in ordinary civil cases, treating the argument as an affirmative defense on which the District has the burden of proof.

There are no material facts in dispute. C.W. did not respond to this argument in his Response (**# 59**), but briefly addressed the issue in the Reply (**# 60**) to his own Motion, stating that the facts that form the basis of the non-IDEA claims were fully presented to and considered by the ALJ, thus exhausting his remedies with regard to these claims. (**# 60 at 9**.) This gives rise to a legal issue — does presentation of evidence in the IDEA administrative process that could establish facts upon which non-IDEA claims could be based satisfy exhaustion requirements?

The IDEA anticipates that an aggrieved person may have claims arising under other federal statutes. As to non-IDEA claims it provides:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) *shall be exhausted to the same extent as would be required had the action been brought under this subchapter*.

20 U.S.C. § 1415(*l*) (emphasis added).

The concept of exhaustion is somewhat oblique in this context, necessitating a clarification by the Supreme Court in *Fry v. Napoleon Community Schools*, 137 S. Ct. 743 (2017). The Court explained that, though the IDEA anticipates that an aggrieved person may also be protected by other statutes and may seek remedies under them, if the remedy sought by the aggrieved person under the non-IDEA statute relates to a FAPE, and the request for relief is based on the same facts relevant to a FAPE, then the non-IDEA claim must be asserted pursuant to the IDEA's formal procedures for resolving disputes, bringing a complaint and obtaining a due-process hearing before an impartial hearing officer — an ALJ. 20 U.S.C. § 1415(b)(6), (f)(1)(A). Failure to do so prevents the aggrieved person from bringing the non-IDEA claim in

14

federal court after the administrative procedure has concluded. 20 U.S.C. § 1415(*l*).

To determine whether a non-IDEA claim seeks relief for the denial of a FAPE, the Supreme Court directs the Court to look to the substance, or gravamen, of the Complaint. It further directs the Court to note the diverse means and ends of the statutes covering persons with disabilities — *e.g.*, the IDEA providing meaningful access to education and the Rehabilitation Act and ADA rooting out disability-based discrimination.[10] *Fry*, 137 S. Ct. at 755–56.

As noted, C.W. concedes that the facts underlying the IDEA claim and the non-IDEA claims are the same. And as stated, C.W.'s complaint alleges three additional causes of action beyond the IDEA: violations of the Rehabilitation Act, ADA, and Equal Protection Clause. The sum total of the District's actions or omissions underlying these claims is:

- As to the Rehabilitation Act claim, District denied the full benefits of public education, failed to provide an opportunity to participate in the public education afforded to others, failed to provide a public education as effective as that provided to others, provided educational services that were substantially different than those provided to other students, limited C.W.'s enjoyment of the rights enjoyed by other students, and

---

[10] The Court provided hypothetical questions to assist the inquiry.

> First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school — say, a public theater or library? And second, could an *adult* at the school — say, an employee or visitor — have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.

*Id*. at 756.

- decided to place C.W. in a residential facility.  (**# 16 ¶ 70**.)
- As to the ADA claim, the District denied the opportunity to benefit from educational services equal to that afforded to others, denied educational services that are as effective in affording equal opportunity to gain the same benefit as other students, denied the opportunity to participate in educational services appropriate to C.W.'s needs, failed to make reasonable modifications to its services, used methods of administration that had the effect of defeating the objectives of the District's educational programs, and decided to place C.W. in a residential facility.  (**# 16 ¶ 85**.)
- Finally, as to the Equal Protection claim, the District denied access to a public education on the basis of his disability and treated C.W. differently in home-based placement than it treats other students.  (**# 16 ¶¶ 95–96**.)

The gravamen of the Amended Complaint seeks relief for the denial of a FAPE.  No allegation concerns facts unrelated to educational services.  Both the Rehabilitation Act and ADA claims are based on the result of the 2017 IEP.  (**# 16 ¶¶ 70(f), 85(f)**.)  Though some allegations strike at the District's different treatment of other students, these allegations receive no factual enhancement — the rest of the Amended Complaint is silent on any discrimination suffered by C.W.  Indeed, the entire factual recitation preceding the claims for relief expressly relates to the IDEA, the District's handling of C.W.'s education, and how egregious placement in a residential facility is.  (**# 16 ¶¶ 7–54**.)  Notably, the Amended Complaint states that its factual recitation is not intended to be complete and incorporates the administrative record, though the record — devoid of any reference to the federal claims brought here — relates exclusively to the provision of educational services.  The only real difference between the IDEA appeal and federal claims is not in their substance, but in C.W.'s procedural request for monetary damages (**# 16 ¶ 101**), which are

unavailable under the IDEA. The non-IDEA claims are simply alternative legal theories seeking to redress the same conduct — the District's failure to offer C.W. a free appropriate public education.

Unlike the plaintiff in *Fry*, where nothing in the nature of the complaint suggested any implicit focus on the adequacy of education, all of C.W.'s allegations relate to educational services. *See* 137 S. Ct. at 758. If C.W. were to file the same complaint against another place of public accommodation, such as a library or theater, it would make no sense. Thus, C.W.'s non-IDEA claims are the exact sort that Congress contemplated in enacting the IDEA exhaustion provision.

There is no suggestion that the non-IDEA theories were brought before the ALJ. Indeed, C.W. argues that was not necessary to do so because the same facts were before the ALJ. Not only is that statement not supported by any cited authority, it is contrary to the express language of the IDEA. *See* 20 U.S.C. § 1415(*l*) (requiring exhaustion "before the filing of a civil action *under such laws*"). The laws and legal *claims* are therefore important. This requirement consolidates all theories seeking the same remedy on the same facts in a single action. Doing so saves cost, increases judicial efficiency, and best provides for comprehensive and consistent determinations. In this case, Congress required C.W. to bring his non-IDEA claims before the ALJ in the due-process hearing. Having failed to do so, he cannot now assert them in this action. They are subject to dismissal.

## V. CONCLUSION

For the foregoing reasons, the Administrative Law Judge's decision is **REVERSED** and **REMANDED** for a determination on what relief the Plaintiff is due given that the 2017 IEP has not provided a FAPE at all times it was operative. The Plaintiff's Motion for Summary

Judgment (**# 56**) is **GRANTED IN PART** in that the ALJ is reversed and is **DENIED** in all other respects.    The Defendant's Motion for Summary Judgment (**# 57**) is **GRANTED IN PART** in that the Plaintiff's remaining, non-IDEA claims are **DISMISSED** and is **DENIED** in all other respects.    The Clerk is directed to close this case.

    Dated this 25th day of September, 2019.

**BY THE COURT:**

*Marcia S. Krieger*
_____
Marcia S. Krieger
Senior United States District Judge